[County of Dallas v. Timberlake et al.]

| 54 | 403 |
| 96 | 299 |
| 54 | 403 |
| 117 | 366 |
| 118 | 193 |
| 54 | 403 |
| 124 | 193 |
| 124 | 194 |
| 54 | 403 |
| 142 | 437 |

# County of Dallas *v.* Timberlake *et al.*

*Bill in Equity by County against Tax Collector, and several Sets of Sureties on official Bonds for account, discovery, &c.*

*Bill; what not liable to objection, on ground of multifariousness, misjoinder of parties, want of equity, &c.*—The county of Dallas filed a bill against its late tax collector, the sureties on his original bond, the sureties upon other additional bonds given during his term, and against alienees of property fraudulently conveyed by the principal and sureties, &c. It alleged that during each of the periods between the dates of the several bonds, the collector had made false ánd fraudulent additions of the assessed value of the property, on which it was his duty to collect taxes, greatly lessening the amount; that he had collected taxes of persons failing to pay in former years, or who had not been assessed, and made no report of the same, and of which complainant could obtain no information; that he had refused to exhibit his stub-book, showing to whom he had issued receipts for taxes and for what sums; that by such means complainant was prevented from obtaining evidence of the amounts due the county, which amounted to a large sum; that the collector and several sureties, in order to avoid liability, had fraudulently sold and transferred their property, much of which was unknown to complainant, and have become insolvent, &c.; that certain described lands, on which, it is averred, the tax collector's bonds operated as liens for taxes not paid over, &c., were transferred by the principal and his sureties, after his defaults, to persons in collusion with the sureties, &c. The bill prayed an account of the taxes collected; for discovery as to the amount thereof, and the production of the stub-books; for a discovery of the property of the principal and certain sureties, which had been conveyed, subject, as the bill alleged, to the lien of the bonds; for an ascertainment of the times when the several defaults occurred; for the setting aside of the conveyances, &c., and for an enforcement of the lien, by a sale of the property subject to it, to pay the amount due, and for general relief. *Held :*

1. The bill plainly presented a case for equitable cognizance. Under § 44 of the revenue law of 1868, the lien of the tax collector's bond attaches from the date of his default, and there being several sets of sureties, and defaults occurring after the date of each of the additional bonds, some of the sureties, under the provisions of the statute (R. C., §§ 180-181) being responsible for the whole time, but answerable only jointly with the sureties upon such additional bonds, for defaults occurring after they were executed, and the rights of alienees of property of the sureties depending upon the date of such defaults, a court of equity is the only tribunal in which parties with such diverse and conflicting interest can be brought together, and their respective rights and liabilities properly adjudicated.

Apart from this, the bill presents a case not only of matters of account, but of agency, where the principal fraudulently alters his books, and withholds from his principal, evidence of transactions with a multitude of persons, rendering necessary a resort to equity for discovery, and to compel the production of books, without which the principal can not be informed of the state of the accounts.

2. The one pervading purpose of the bill is to compel payment of money due complainant from the tax collector and his sureties, and out of property which they contracted should be liable therefor, all the defendants being either liable on the bonds, or, as claimants of property on which the bonds operated as liens; and hence, the bill is not multifarious.

3. The lien of the bond is not a mere creature of statute, enforceable only by execution at law, but is a lien arising by contract; and not being capable of enforcement until a judicial ascertainment of the amount for which it shall operate as a lien, a court of equity, in a case like the present, is a proper tribunal in which to have such lien ascertained and enforced.

4. The summary remedy given by statute, against defaulting tax collectors and their sureties, for the collector's defalcations, is merely cumulative, and does not exclude the ordinary remedies for the recovery of money not paid over, whenever suit therefor is maintainable, either at law or in equity.

5. *"Judgment," meaning of, as used in section 44 of revenue law.*—The word "judgment," as used in section 44 of the revenue law of 1868, with reference to the tax collector's bond operating as a lien, for any "judgment which may be rendered against him in an official capacity," &c., includes any judgment rendered against him as an individual for an official delinquency, whether it be a judgment in a court of law or the decree of a court of equity.

6. *Defendant, when can not complain that sworn answer is waived, &c.*—Where the case is such that the answer of one defendant is not evidence against his co-defendants, it is not ground of objection to the bill, that it requires sworn answers of some of the defendants, and, under our rules of practice, waives answer on oath as to others.

APPEAL from Chancery Court of Dallas.
Heard before Hon. CHARLES TURNER.
The opinion states the case.

J. C. COMPTON, and BROOKS, HARRALSON & ROY, for appellant.—It is not important that the statute says that the lien on the property of the tax collector shall be "for the amount of any judgment which may be rendered against him in his official capacity;" for, the judgment is only the mode of ascertaining the amount of the default—nothing more; the lien existed before the recovery of the judgment. The statute provides that the *bond* shall operate as a *lien* from its execution. No lien for the security of a debt is ever enforced without ascertaining the amount of the debt by the judgment of a court; it would be impossible to know the amount of the default or debt until it was ascertained by judgment, and the judgment could be obtained either in a court of law or of equity. The statute provides that the bond of the tax collector shall operate as a lien upon his property from the date of its execution, and on the property of his securities from the date of his default. It is argued in behalf of the securities that the *default* dates from the recovery of the judgment, and that, therefore, the lien on the property of the securities also dates from the recovery of the judgment; but, it is too clear for argument that the *default* must exist before the recovery of the judgment, else no judgment could be recovered. In a court of law the judgment could not be evidence of the *specific* time when the default was committed, but would be simply evidence of the fact that a default had been committed, and of the amount

[County of Dallas v. Timberlake et al.]

thereof, and in order to enforce a lien upon the property of the securities against a purchaser, it would be necessary to resort to chancery to ascertain the date of the default.

The statute certainly intended to create a lien which did not exist before. If so, what is the nature of this lien and when does it begin? If the legislature designed to provide that the judgment should be a lien, they did the thing which was entirely unnecessary, for, by the general law, a judgment is a lien from its date. The statute does not provide for a lien founded on a judgment or growing out of the same, but expressly that the bond shall operate as a lien on the property of the tax collector from the date of its execution, and on the property of his securities from the date of his default. Each set of sureties must answer for their own defaults.— *Williams v. Boring*, 17 Ala. 524, and cases cited.

The sureties on the bonds in operation at the time of each default are liable for that default. Successive securities are liable for money then held and not paid over at the time they became securities, and if money was converted at the time of their continuance on the bond, no matter when received, they are liable for it.—*Townsend v. Everett*, 4 Ala. 607-611; *Moore v. Madison Co.*, 38 Ala. 671.

The bill alleges facts of which the complaint cannot make proof without a discovery, therefore, as a bill for discovery it is good, although it is not a bill for that purpose alone, and contains other matters which give jurisdiction to a chancery court.—1 Story's Eq. Juris., § 74, *a, b, c, d*; Story's Eq. Pl.; *Lucas v. Bank of Darien*, 2 Stewart, 280; *Horton v. Mosely*, 17 Ala. 794; *Perrine v. Carlisle*, 19 Ala. 686.

The defendants objection to the bill of complaint for multifariousness is groundless. They seem to overlook the fact that there was but one tax collector, and but one line of official duty, and that each and all of his securities are more or less liable for the manner in which he has discharged the duties of his office and are responsible for the money which he has collected and failed to pay over. He and some of his securities are on all the bonds. If all his securities are liable for all his defaults, they certainly are proper, if not necessary parties. If a portion of his securities are liable for some of his defaults only, and others for all, then it is absolutely necessary to make them all parties to ascertain their respective liabilities. The purchasers of the property from the sureties are made parties to the suit, and as all of these, as alleged in the bill, purchased with notice of the defaults of the tax collector.

The bill is, therefore, not multifarious; see authorities.— *Kennedy v. Kennedy*, 2 Ala. 572; Story's Eq. Pl. §§ 533, 534,

[County of Dallas v. Timberlake et al.]

539; *Boyd, Adm'r, v. Hunter*, 44 Ala. 718; *Donelson v. Posey et al.*, 13 Ala. 752; *Halstead v. Shepard*, 23 Ala. 569; *Felder et al. v. Davis*, 17 Ala. 418; *Horton v. Sledge*, 29 Ala. 478.

MORGAN, LAPSLEY & NELSON, *contra.*—It is a condition of the lien given by the revenue law upon which alone it can have any other than a mere potential legal existence, that judgment shall be rendered against the tax collector in his official capacity. No other mode of establishing the lien is provided, nor of fixing, as against the sureties, the time when it begins to operate.

This period differs in the cases of the principal and his sureties. A judicial condemnation is thus provided for, which must precede any assertion of the lien by judicial procedure.

The lien created by this statute is not a *preference* lien, like a lien for taxes, as described in *Glidney v. Devoors*, 8 Geo. Rep. 879, nor has it any such *priority* as is given under the statutes of the United States, as described in *Conrad v. The Atlantic Insurance Co. of N. Y.*, 1 Peters, 386. It is the simplest form of lien created by statute without any definition, except such as belongs to the word "lien," and without any capacity of being enforced, except by some procedure based upon a judgment; and until it is so established it is a mere potential right of satisfaction out of the property of the parties bound on a tax collector's bond.

The lien declared by the act of 1868 is a means simply of collecting from the tax collector and his sureties the taxes he had collected from the people, and our legislature wisely, and in conformity to constitutional requirements, provided that a *judgment* against the tax collector in his official capacity should precede any attempt by the State to enforce the lien.—Blackwell on Tax Titles, pp. 38 to 42, and pp. 217 to 221; *Fretwell v. McLemore*, 52 Ala.

The bill in this case is designed to ascertain the default of the tax collector; to distribute the burthen of it upon his sureties, and also between the sureties on several sets of bonds, to fasten the lien on the property of the tax collector and his sureties; to set aside alleged fraudulent conveyances of property made by some of the sureties.

If the case made by the bill was one unquestionably within the jurisdiction of a court of equity, the melange presented in this sweeping effort to unite distinct and repugnant rights in one litigation would be fatal to it.

But the whole case depends upon the supposed power of a court of chancery to render a judgment upon a tax collector's bond in a suit against him "in his official capacity" for an alleged default, and then as a consequence of such judgment,

[County of Dallas v. Timberlake et al.]

to proceed to its collection by decrees of condemnation against property held by him or his sureties at the time the bill was filed and before that time.

The power of a court of equity, whatever it may be, to enforce a statutory or other lien, must depend, under this statute, upon its power first to render judgment against a tax collector sued in his official character. It is a *petitio principii* to say that because a lien may follow the judgment, which it can enforce, that the chancery court may render the judgment in order to create this jurisdiction, or to provide a foundation on which the lien may be based.

This is, to all intents and purposes, a mere suit on the bond for damages for its breach. In this phase of the case the bill contains no more and no less than is necessary in an action at law upon the bond. As to the lien claimed in the bill, it is alleged to be a mere statutory lien. It contains no element or incident that gives to it any peculiar claim upon the power of a court of chancery. It is not of that class of liens, or more properly *charges*, which give to chancery an original ground of jurisdiction.—*Peck v. Jenness*, 7 How. (U. S.) p. 620; *Gilman v. Brown*, 1 Mason, p. 221; *Brace v. Dutchess of Marlborough*, 2 P. Williams, 491.

MANNING, J.—The bill in this cause was filed on behalf of the county of Dallas, complainant, against J. C. S. Timberlake, late tax collector of that county from September 6th, 1870, to June 2d, 1871, and against his sureties in the original and several subsequent official bonds, the latter given upon the requirement of the probate judge, on report being made by the grand jury of the insufficiency of the security, except the last bond, dated March 18th, 1871, which defendant, Virgil G. Weaver (it is alleged) insists was required to be given on a petition by him asking to be released from his liability by a preceding bond of February, 1871.

The bill alleges that during each of the periods between the dates of his several bonds, Timberlake collected large amounts of money which he did not pay over; that he made fraudulent and false additions of the assessed values of the property in the county, by which its total value was made to appear about $4,000,000 less than its true value; that he collected large amounts of money from persons who had failed to pay taxes they owed for former years, or had not been assessed therefor, of which he had made no report, and plaintiff could not obtain information; that he refused to exhibit the stub-books in his possession, showing to whom he had issued receipts for taxes and for what sums; and that by such means, complainant was prevented from getting evi-

dence of the amounts he owed the county, which are alleged to be large.

It is also charged that he and his sureties, in order to avoid payment of the moneys thus collected, have fraudulently sold and transferred their property, much of which was unknown to complainant, and have become insolvent, so that money cannot be made of them by actions and executions at law; and that numerous tracts and parcels of valuable real estate, which are particularly described in the bill, and on which, it is claimed, the tax collector's official bonds created liens in favor of complainant for the taxes collected for its use and not paid over, were sold and conveyed or transferred by certain of the sureties on the bonds, after the defaults of the tax collector had occurred, to persons who were informed of such defaults or had notice thereof—and some of said real estate, to persons who took the same, without consideration and collusively, with the knowledge that it was fraudulently conveyed to hinder, delay and defraud creditors, and especially complainant. The several purchasers, and alienees of the various portions particularly set forth, of this real estate, are also made parties defendant to the suit. The bill is filed for an account of the taxes collected; for discovery of the amount thereof by the production of the stub-books; for a discovery of the property of the principal, Timberlake, and of his sureties, Gunnels, Ross and Seivers, of property subject to the lien of the bond, which they (it is alleged) have sold to persons unknown; for an ascertainment of the times when the defaults of the tax collector severally occurred; for the setting aside of the conveyances alleged to be fraudulent, and for an enforcement of the lien by a sale of the property subject to it, to pay the amount due to complainant.

Demurrers were filed alleging want of equity in the bill, that the action should have been at law, misjoinder of parties, multifariousness, &c.; and the bill was thereupon dismissed by the chancellor.

Section 180 of the Revised Code, referring to official bonds given upon requisition, after report by a grand jury or other officer authorized to make it, of the insufficiency of the bonds previously executed, enacts, that "every such additional bond is of like force and obligation on the principal and sureties thereon, from the time of its approval, and subject to the same remedies . . as the orignal bond." Section 181 declares that "in no case provided for under any of the preceding sections of this article, are any of the official bonds previously executed, discharged," &c. And by section 44 of the revenue act of December 31st, 1868, it is enacted "that

the bond of the tax collector shall operate from its execu-
tion, as a lien in favor of the State and county, on the prop-
erty of such tax collector, for the amount of any judgment
which may be rendered against him in his official capacity,
for the State or county taxes, and on the property of his se-
curities from the date of his default."

It is, hence, apparent that the case set forth by the bill in
this cause, is one of great complication. Many persons are
concerned in it, having various degrees of interest, and en-
titled to be parties to the litigation by which their rights and
obligations are to be determined. The tax collector himself
is alleged to have disposed of his property fraudulently to
persons unknown to complainant, and to be insolvent, or that
money cannot be made of him by execution. Some of his
sureties, against whom similar charges are made, are respon-
sible for his defaults during all the time he was in office; but
in respect to defaults occurring after the execution of one or
more of the additional bonds, they are responsible only
jointly with the sureties upon these later bonds, and are,
therefore, interested in showing that the defaults (if any)
were committed after these bonds were made; while, on the
contrary, the sureties on each of the subsequent bonds are
concerned to show that the defaults occurred before the exe-
cution of the bonds which they respectively signed.

So, also, the defendants who were purchasers of lands from
LeRoy Weaver and Virgil Weaver, two of the sureties, after
the bonds they signed were made, are entitled to an oppor-
tunity to show, if they can, that no defaults were committed
before their purchases were completed. For, under section
44, above quoted, from the revenue act of 1868, the liens on
the property of the sureties attach at the times of the de-
faults; the ascertainment of which times is, therefore, a mat-
ter of much importance to all of the sureties, and the pur-
chasers from them, and the inquiry in respect thereto, an es-
sential part of the cause. We cannot yield to the argument
that these liens do not exist and cannot have an origin an-
terior to the rendition of a judgment against the tax col-
lector. The reasons urged in support of this, might be per-
suasive to the legislature, for a change of the law, but can-
not avail to make a court ignore the obvious meaning of its
written words. Plainly, therefore, it is only in a court of
equity that these various parties can be brought together,
and their evidence and arguments against each other, be
heard and considered by a tribunal competent to determine
their respective rights.

Apart, however, from this ground of equity jurisdiction,
others are disclosed by the bill. The chief defendant, Tim-

[County of Dallas v. Timberlake et al.]

berlake, was tax collector of Dallas county. He stood toward it in the relation of an agent for the transaction of important business through a considerable period of time, and involving in detail, many small sums of money collected from hundreds, perhaps thousands, of different persons. And although by the assessments made by another officer, and the perspicuous statement of the results of his labors and those of other officials in assessment books, the law endeavors to provide for as full, and clear and precise an account as it can thus procure to be made, of the tax collector's receipts, yet, there is still opportunity for mistake, or fraudulent peculation. Especially is this so in regard to things which come within the scope of his duties, and are not set down in the book of assessments. Among these, section 50 of the revenue act requires "the collector, while engaged in the collection of taxes, to assess the taxes of persons who have escaped the tax assessor, entering up all such assessments in the back part of the books of assessment for each year," which taxes, also, it is his duty to collect. To every tax payer he must give a receipt for the sum paid to him. Much money might be received by the tax collector from persons against whom no assessments had previously been made, and of which he might make no report; and it is alleged in the bill that Timberlake had collected a large amount of such taxes, for which he has not accounted, and the evidence of which, contained in books of stubs pertaining to the receipts he issued to the tax payers, he withholds from complainant, though requested by it to produce them.

It is alleged, also, that fraudulent additions have been made by him, or confederates with whom he colluded, of the values of the property taxed, in the assessment books, whereby he intended to cheat complainant out of large sums due to it, which he refuses to pay over, or afford a true account of, although often requested; and that complainant cannot ascertain what sums are due from him to it without a discovery, and especially without the production of those stub books.

"Courts of equity," says Justice STORY, "will entertain jurisdiction in matters of account, not only when there are mutual accounts, but also when the accounts to be examined are on one side only, and a discovery is wanted in aid of the account, and is obtained. But in such a case, if no discovery is asked, or required by the frame of the bill, the jurisdiction will not be maintainable. And *a fortiori,* where there are no mutual demands, but a single matter on one side, and no discovery is required, a court of equity will not entertain jurisdiction of the suit, although there may be payments on

the other side, which may be set off; for, in such a case, there is not only a complete remedy at law, but there is nothing requiring the peculiar aid of equity to ascertain or adjust the claim."—1 Eq. Juris. § 458. It was in accordance with these views, that this court held that the suit of *Dickinson v. Garthwaite*, 34 Ala. 638, to which we are referred by counsel of appellees, was rightly dismissed by the chancellor.

But the case before us is one of agency as well as of account; and agents should unreservedly disclose their transactions as such, to the principals for whom they were acting. Mr. STORY says (§ 462) "it rarely happens that the principal is able, in cases of controversy, to establish his rights, or to ascertain the true state of the accounts without resorting to a discovery from the agent. . . . . The rules of law, in all such agencies, require that the agent should keep regular accounts of all his transactions with suitable vouchers. And it is obvious that if he can suppress all means of access to his books of account and vouchers, the principal would be utterly without redress except by the searching power of a bill of discovery, and the close inspection of all books under the authority and guidance of a master in chancery. . . . In cases of fraud, also, it is almost impracticable to thread all the intricacies of its combinations, except by searching the conscience of the party, and examining his books and vouchers; neither of which can be done by the courts of common law.—See, also, *McKenzie v. Johnston*, 4 Madd. 373; *Halstead v. Rabb*, 8 Port. 63; *Kirkman v. Vanlier*, 7 Ala. 217.

Ample reason is shown in the allegations of this bill, for a resort to equity.

In a case like the present, it does not follow that the bill is not maintainable because it dispenses, under our rules of practice, with the oaths of Timberlake, the collector, and of LeRoy G. Weaver and his wife, Jane Weaver, to their answers. It is founded on other grounds of jurisdiction than discovery merely. And, although complainant may not be willing to take the chief defendant's answer under oath as true, the production which complainant claims of the books in the collector's possession, or under his control, may be important to the elucidation of the subject in controversy, and to the exposure of the frauds with which he is charged.

The providing by statute of a summary proceeding for the ascertainment or recovery of money due to the State or county for taxes collected by its official agent, does not prevent the bringing of a regular suit at law or in equity against him, when this would be more proper and efficient. The summary remedy is only cumulative. And all legislation de-

signed and tending to protect the interests of the State and to secure the fidelity and responsibility of those entrusted with the collection and safe keeping of the public revenue, should be construed—unless a contrary intention plainly appear—not as abolishing or impairing other legal methods of effecting the same purposes, but as supplemental thereto, and so as to make it effectual as such.

This rule—if there were any doubt of the plain meaning of 'the section—would require us to hold, also, that the words, "any judgment which may be rendered against him in his official capacity," in section 44 of the revenue act, before quoted, (which makes the tax collectors's bond operate as a lien from its execution on his property, and "from the date of his default," on the property of his sureties), are not to be understood in a technical or restricted sense as the judgment in an action at law, only, but as "any judgment" of any court to which the State or county might properly resort for its. coercive aid. The expression, "in his official capacity," has no influence one way or the other, in this interpretation. Wherever the judgment may be rendered, whether in a court of law or equity, it is rendered against him as an individual, for a delinquency when in an "official capacity."

Nor can we agree with counsel for the appellees in holding that the lien which the bond "operates," is like that of a judgment or execution of a court of law, a creature of legislation merely, and not within the cognizance of a court of equity. The only reason why a court of equity cannot enforce the latter lien is, that it pertains as a mere incident to the judgment or execution and is inseparable therefrom. But a tax collector's bond being a contract, by which the law has previously declared liens shall be created, its liens are liens by contract, on the part of the persons who execute the bond, as much as that of a mortgage would be. Such lien is intended, also, to be a security quite as effectual for the benefit of the State and county, from the time the lien operates, as a mortgage would be to a mortgagee, with this difference, that it would not, as a mortgage might, give a right of action at law, but can be carried into effect, as a specfic lien, in a court of equity only; and the amount of the tax collector's defalcation being indeterminate, must be ascertained by the judgment of some court having jurisdiction to ascertain it, before the lien can be made available; because, until such judgment is rendered, the amount for which the bond shall operate as a security, cannot be known. This idea it, doubtless, was, and not any unexpressed purpose of impairing the availability of the security, that led to the expression in the

statute, that the bond should operate as a lien "for the amount of any judgment which may be rendered against him in his official capacity." In any instance, indeed, of a resort to a court for the enforcement of a lien by the sale of property, the amount for which the lien is to be enforced, must be determined by the judgment of the court; this is only, from the beginning, more obviously necessary in cases like the present, in which the instrument creating the security affords no intimation of the sum for which the makers of it will be really liable, and that sum is the uncertain amount of defalcations that ought not to, and may not, happen at all. We do not find the bill to be multifarious. There is one purpose only running through the whole suit—that is, to obtain payment of the amount due to the county complaining from its late tax collector, out of him and the persons who agreed to be his sureties, and out of the property on which they gave a lien as security for such payment, securities required as a condition upon which only the tax collector was permitted to discharge the duties of his office. Every individual made a party defendant is alleged to be either one of the persons so liable personally, or a purchaser or claimant of property subject to liens which some of them created for the protection of complainant from loss for the defaults of the principal defendant, and is, therefore, interested in the cause, and entitled to take part in the controversy. Where the direct, proper and single object of a bill in equity is to obtain payment of money due to the complainant from persons and property that were thus made liable to pay it, but such object cannot be attained without overturning or impairing titles claimed by others in such property, a bill which makes all of them parties to the suit, is not thereby made obnoxious to the charge of multifariousness, however numerous such defendants may be.—See *P. & M. Bank v. Walker*, 7 Ala. 927; *Chapman v. Chunn*, 5 *id.* 397; *Kennedy v. Kennedy*, 2 Ala. 573.

The objection taken by LeRoy G. Weaver and Jane Weaver against the waiver by complaint, of a verification of their answers by oath, while others of the defendants are required to answer under oath, is not well founded. The answer of one defendant is not evidence against his co-defendant except in certain cases of peculiar relationship between them, which does not exist in this cause.

The decisions above made seem to embrace all the questions properly presented by the demurrers in this cause; and the result is, that the decree of the chancellor is reversed and the cause remanded.