# Colt *v.* Barnes.

*Bill in Equity by Trustees for Foreclosure of Mortgage on Rail-
road for Benefit of Bondholders.*

1.  *State indorsement of railroad bonds ; extent of statutory lien.*—Under the
provisions of the act approved February 21st, 1870 (Sess. Acts 1869-70, pages
149-57), authorizing the indorsement by the governor, in the name of the
State, of the bonds of railroad companies, although no indorsement could be
made until twenty continuous miles of road had been finished, completed and
equipped, and subsequent indorsements were authorized only as sections of
five continuous miles were finished, completed, and equipped ; yet the statu-
tory lien given to the State, on account of such indorsements, was not limited
or restricted to the portions of the road then finished, nor to the property
then owned by the railroad company, but extended to the entire road, its fran-
chises, and all property then belonging to it, or afterwards acquired ; and this
lien, by the express words of the statute, was declared prior and superior to
all liens or incumbrances created by the railroad company, and all other claims
existing or to exist against it.

2.  *Same ; subrogation of bondholders to statutory lien.*—This statutory lien is
declared to be "for the payment by said company of said bonds, with the
interest thereon, as the same becomes due ;" and a railroad company having
executed a mortgage, or deed of trust, for the benefit of all its bondholders,
and afterwards made default and become bankrupt, the holders of the indorsed
bonds are entitled to be subrogated to the statutory lien of the State, on bill
filed by the trustees to foreclose the deed of trust, and are entitled to be first
paid out of the proceeds of sale of the property.

3.  *Practice as to distribution of funds between several claimants, under bill to
foreclose.*—Under a bill to foreclose a mortgage or deed of trust executed by a
railroad company for the benefit of all its bondholders, filed by the trustees,
against the purchasers of the equity of redemption at a sale in bankruptcy ;
all the bondholders having come in and proved their claims before the regis-
ter under a reference, and his report disclosing the fact that some of the bonds
had been indorsed by the State under the provisions of the act of February
21st, 1870 ; the chancellor must, of necessity, determine the order in which
the claims shall be paid ; and since no motion or petition was necessary for
that purpose, it is immaterial that the holders of the indorsed bonds asserted
their right of priority by petition, and that the chancellor acted on it without
notice.

APPEAL from the Chancery Court of Lee.

Heard before the Hon. N. S. GRAHAM.

The bill in this case was filed on the 3d November, 1877,
by William H. Barnes and Henry Clews, as trustees under
a deed of trust executed by the East Alabama and Cincin-
nati Railroad Company, for the benefit of the holders of its
first mortgage bonds. The deed, which was made an exhibit
to the bill, conveyed the franchises and all the property of
the railroad company to said trustees, "in trust, and upon
the trusts, uses and purposes hereinafter expressed, of and

[Colt v. Barnes.]

concerning the same, for the benefit and security of the persons and bodies corporate who have become, or who shall at any time become, the holder or holders of said three thousand five hundred bonds, or any of them, which have been or shall be issued and negotiated by the said party of the first part, without preference to the holders of any one or more of said bonds, over the holder or holders of any of the others, by reason of priority in time of issuing or negotiating the same, or. any other matter whatsoever." The railroad company became bankrupt in 1873; and at a sale by the assignee in bankruptcy, James I. Colt, Richard H. Kelly, B. Boyle and V. S. Murphey became the purchasers; and they took possession under their purchase, and were operating the road when the bill was filed. These purchasers were made, with the railroad company, the only defendants to the bill; and the prayer was for the appointment of a receiver, an account of the rents and profits received by the defendants, and a foreclosure of the deed of trust by a sale under the order of the court. The chancellor held the bill well filed, and ordered the register to ascertain and report the names of the bondholders, and the amounts due to them respectively. Under this reference, the holders of the bonds appeared before.the register, and proved their claims; and he reported to the chancellor the several names and amounts, showing that bonds to the amount of nearly $750,000 had been indorsed by the State, and about $500,000 were unindorsed. The report was confirmed without objection. On the same day, the holders of the indorsed bonds filed a petition, claiming a right to be subrogated to the statutory lien of the State on account of its indorsement, and to prior satisfaction out of the proceeds of sale when brought into court. The chancellor held that they were entitled to this right of subrogation and priority, and rendered a decree accordingly; and this decree is now assigned as error by the holders of the unindorsed bonds.

CLOPTON, HERBERT & CHAMBERS, for appellants.—1. By the act of February 19th, 1867, " To establish a system of internal improvements in the State of Alabama " (Pamph. Acts, 1866-7, p. 686), a lien, in favor of the State, upon the section or sections of the road finished, equipped, and completed, including the road-bed, right of way, bridging, grading, and masonry, upon all the stock subscribed for, and upon the iron rail, chairs, spikes, and equipments, when purchased and delivered, was declared, upon the indorsement of the bonds by the governor, for such section or sections. A lien, in favor of the State, upon the entire road, and all the prop-

erty owned by the company, as incident to, or necessary for its business, and depots and depot-stations, was not given by the act, until the *whole of the road* was completed. The railroad in this case was never completed, and the State had a lien only upon the property first above mentioned. The mortgage executed to the complainants covers the entire railroad, extending from Eufaula to Guntersville, its entire franchises and privileges, and much other property, upon which the State had no lien by the statute; and yet, the decree of the court gives to the holders of the indorsed bonds a prior lien on all the property, franchises and privileges covered by the mortgage, upon a large portion of which the State had no lien. Upon all the property included in the mortgage, and upon which the State had no lien, it is manifest that the holders of the indorsed and unindorsed bonds had equal liens by virtue of the mortgage, and the decree of the chancellor is clearly erroneous in this respect.

2. It is true, as a general rule, that a creditor has a right to be subrogated to all the liens or securities given to, or in the hands of a surety, for his indemnity; such liens or securities being trusts for the better security of the debt. It is also true, that the State, by virtue of the statute, had a first lien, so far as respects the property upon which a lien was given by the statute. This right of subrogation, however, extends no higher or further than the rights of the surety, and to such remedies as the surety may have to enforce such liens or securities. The statute does not give the State any right to sell, or have sold, the road and its property, upon a mere failure to pay the interest on the bonds. The only right which the statute gives, in such cases, is a seizure of the road, and the appointment of a receiver to receive the rents, issues, and profits, and apply them to the payment of the interest. Provision is made for a sale of the road by proceedings in chancery, in *the name of the State of Alabama*, to pay the bonds when they fall due, but in no other event. The holders of the indorsed bonds, by virtue of the *mere right of subrogation*, and even upon proper proceedings to assert that right, would not be entitled to a sale of the road and property upon the failure to pay interest only, but, at furthest, would only be entitled to the appointment of a receiver to take possession of the road and property, and apply the rents, issues, and profits to the payment of the unpaid interest. The lien in favor of the State is a statutory lien, without the necessity of a deed or other conveyance— a right given only by statute, which did not previously exist; and the remedies for its enforcement, given by the statute, are exclusive. But the decree of the court, in effect, orders

VOL. LXIV.

a sale of the property, and gives priority to the holders of the indorsed bonds, because of their right of subrogation, and in this respect is erroneous.—*Osborn v. Noble*, 46 Miss. 449; Brandt on Suretyship & Guaranty, § 284; *Houston v. Branch Bank*, 25 Ala. 250.

3. This right of subrogation is personal, and may be waived by the creditor. It has been held, that if a surety, knowing of the existence of a mortgage, given by the principal for the payment of a debt, take a distinct security for his indemnity from the principal, he thereby waives his right of subrogation to the mortgage held by the creditor: "He must proceed under one or the other of the two rights which he claims. If he had bound himself to pay the mortgage, and had done so, he would then have been entitled to the benefit of the mortgage. He has not done so. He has bargained by a separate instrument for an indemnity which is perfectly distinct. * * * * If a surety pay off the mortgage, he is entitled to the benefit of all the securities. But, here, the plaintiff has contracted with a mortgagor, for whom he is surety, that he should receive a particular species of indemnity, if he pay off any part of the principal or interest of the mortgage. That indemnity he is entitled to, and not to the benefit of the mortgage paid off."—*Cooper v. Jenkins*, 32 Beavan, 337; *Cromwell's Appeal*, 7 Watts & Serg. 305; Brandt on Suretyship and Guaranty, § 267.

The holders of the indorsed bonds, knowing that the State had the statutory lien, took from the company a distinct security for the bonds—to-wit, the mortgage executed to the complainants as trustees—which extended to and embraced a large amount of property, upon which the State had no lien, to which they could be subrogated; and which mortgage provided, in case of default for six months in the payment of interest, that the trustees might sell the entire road and property, and out of the proceeds pay the due and unpaid interest and the principal of said bonds, whether the principal be due or not; and also contained other terms and provisions, entirely differing and distinct from the statutory lien of the State. By the terms of the mortgage, the trustees have the right to treat the principal of the bonds as due upon default to pay interest due for the space of six months. By taking such distinct security for the payment of the bonds, the holders of the indorsed bonds waived any right of subrogation which they would otherwise have had, upon the same principle that a surety waives his right of subrogation by taking distinct security from the principal debtor.

4. The rights of the holders of the bonds, under the mortgage, are different from the rights which they would acquire

by subrogation to the lien of the State. It is clear they could not enforce and claim both of these conflicting rights at the same time. The holders of the indorsed bonds had an election between their rights under the mortgage and their rights of subrogation to the lien of the State. The filing of the bill in this case by the trustees in the mortgage, to foreclose it by a sale of the property thereunder, and suffering the bill to proceed to a final decree without objection to its nature and character, or the purposes for which it was filed, was an election by the holders of the indorsed bonds to take under the mortgage.

5. The filing of a bill to foreclose the mortgage,which included, with other property, the property upon which the State had a lien, operated to discharge the State from liability. Its effect and operation were, by a judicial sale of the property, to defeat, or, at least, embarrass the State in the prosecution of the remedies which the statute provided for its indemnity. These remedies were intended for the protection of the State alone, and not of the bondholders ; and a bondholder has no right, against the interest of the State, to pursue any remedy, which embarrasses the State in the pursuit of its statutory remedies. If he does so, he damnifies the State, which is surety merely, and thereby releases it from liability to him, forasmuch as he thereby deprives the State of its only means of indemnity and protection against its contingent liability as indorser. This court, speaking of the mortgage in this case, has said: " It is not a lien or security for the default of the State the deed of trust affords ; but a lien or security for the default of the corporation, the principal debtor, which alone can involve the State in loss." Therefore, when the bondholder elected to rely upon the mortgage for security against the default of the corporation, he elected to rely on it in preference to a reliance on the liability of the State as indorser ; and such election must necessarily operate, either to discharge the State from liability as indorser, or as an election to rely on the mortgage, rather than on his right to subrogation to the lien of the State. If a creditor parts with, or renders unavailable, securities or any fund which he would be entitled to apply in the discharge of his debt, the surety becomes exonerated, to the extent of the value of such securities ; because securities, which the creditor is entitled to apply in discharge of his debt, he is bound to apply, or to hold them as a trustee ready to be applied for the benefit of the surety.—*Cullom v. Emanuel*, 1 Ala. 23. Upon the same principle, the holder of an indorsed bond, who asserts a claim under, or seeks the enforcement of a lien created by a separate and distinct

mortgage in his favor, for the security of the common debt, and thereby appropriates to the payment of this common debt the property upon which the State as indorser also has a lien, waives his right of subrogation to the lien of the indorser, or certainly elects to rely upon the security afforded by his mortgage rather than the right of subrogation. The lien of the mortgage was subordinate to the lien of the State, so far as regards the property against which both liens existed. The holder of an indorsed bond can not enforce the lien created by the mortgage, which is the inferior lien, and then, or at the same time, assert also a right to the enforcement of a superior lien for his benefit. These two rights are conflicting, and the bondholder must elect upon which he will rely. The bill filed in this case by the trustees under the mortgage for the benefit of the bondholders, secured by the mortgage, was an election to rely on his rights under the mortgage.—*Kelly v. Trustees of Ala. & Cin. R. R. Co.*, 58 Ala. 489, in which case these principles seem to have been recognized by the court, in deciding upon the right and power of the company to execute the mortgage.

6. Subrogation is the substitution of a new for an old creditor—"the act of putting, by a transfer, a person in the place of another." It is a mere creature of equity, and does not arise from any contract or agreement between the parties, but, in a case like the present, from the relation of creditor and surety. Its enforcement, in any given case, depends upon the special circumstances of the case. It will not be enforced, when it conflicts with any other rights of the creditor or surety, as the case may be, or when it conflicts with, or impairs the rights of other creditors. It will not be enforced, when the creditor can enforce the payment of his debt by any other mode. It was the creature of necessity, and was adopted by courts of equity to prevent a failure of justice, and should not be enforced when it would work inequality and injustice. Conceding that the holders of the indorsed bonds had a right to be subrogated to the lien of the State, yet, with this right existing, and with a knowledge of it, they, in connection with the holders of the unindorsed bonds, took and accepted a distinct and specific security—the mortgage—for the benefit of the holders of all the bonds, indorsed and unindorsed, without preference or priority by reason of the time of the issue or negotiation, or from "*any other matter whatever*." Under these circumstances, and in view of the foregoing principles, the holders of the indorsed bonds must be held to have originally waived their right of subrogation, or, at least, that they are estopped from setting it up against the holders of unindorsed bonds,

who acquired their bonds on the faith and credit of the mortgage. The holders of the indorsed bonds can not claim under and against the mortgage at the same time.—*Reaves v. Garrett*, 34 Ala. 558, 561; *Morris v. Hall*, 41 Ala. 527; *Hart v. Johnson*, 6 Ohio, 87.

7. The case made by the bill was adapted alone to a foreclosure of the mortgage, and a sale of the property for the equal benefit of the holders of all the bonds, indorsed and unindorsed. No other relief could have been granted, under such a bill, without violating the universal rule, that relief can not be granted for matters not alleged in the bill, although they may be apparent from other parts of the pleading and evidence. It is a radical violation of this fundamental rule, to decree priority of lien, because of a real or supposed right of subrogation to the lien of the State in favor of the holders of the indorsed bonds, under and upon a bill filed exclusively for the purpose of foreclosing a specific and distinct mortgage; and in which bill no right of subrogation is claimed, and no facts averred from which such right can be claimed. The first time it was brought to the attention of the court that some of the bonds were in fact indorsed by the State, and others not, was by the report of the register made December 1st, 1879, although a suspicion of such fact seems to have existed at the time the decree of reference was made. The first claim to a priority set up by the holders of the indorsed bonds was by the petition, filed by them December 5th, 1879. By Rule 97 of Chancery Practice, this petition could not be heard but upon one day's notice in writing, unless notice is waived. No notice of the filing of the petition was given, or waived. It was not permitted even to lay over for one day after being filed; but on the same day on which it was filed, the court rendered its decree, not upon the case made by the original bill, but upon a new and different case made by this petition. A petition was not the proper proceeding to set up in such a case a right of priority, because of a right of subrogation. It is not permissible, or proper, by a mere petition, to change the entire nature and character of the case. More formal proceedings than a mere petition are requisite to accomplish this end. When the holders of the indorsed bonds appeared, and filed their bonds before the register under the decree of reference, they should then, if they desired to assert their right of subrogation, have done so by a cross-bill proper, or an original bill in the nature of a cross-bill. But, even if a petition is an appropriate or proper remedy in such cases and for such purposes, those having opposing interests should be allowed an opportunity to contest the same, and a

[Colt v. Barnes.]

decree should not be made upon an *ex parte* petition, as was done in this case.—*May v. Duke,* 61 Ala. 53, 58; *Erwin v. Cullom,* 4 Ala. 461; *Cowles & Ledyard v. Andrews,* 39 Ala. 125; 10 Pick. 134; 9 Gill & J. 193.

W. H. BARNES & SON, *contra.*—1. The question of priority was properly raised. The trustees were not presumed to know that there was any conflicting interest between the bonds secured by the deed of trust. All of the bonds are secured by the same deed, and the trustees appointed therein were the trustees of all the holders of bonds secured thereby alike; and it would have been unseemly in them to raise any question between their *cestuis que trust,* and all mention of anything likely to produce collision between them was very properly omitted from the bill. It was altogether proper to leave questions of diverse interest to the *cestuis que trust,* to be determined by them themselves whenever, at any stage of the proceedings, the facts should appear that would justify controversy between them. This is clearly the intention and sense of Rule 107 of the Chancery Practice. Suppose, for instance, that the fact of issuance of both indorsed and unindorsed bonds had not appeared from the exhibit to the bill of complaint, and the first intimation of such issuance of both kinds had first appeared from the register's report; it certainly can not be supposed that the trustees would have been compelled to amend their bill, and make it one of interpleader. This certainly would be officious on their part, as the parties entitled to priority might be content to allow equal distribution. Suppose the proceedings of the case should not develop the ground of their claim to priority at all, but it rested in their own knowledge; how would they raise the question, except by petition, or motion, as in this case? This is especially so, when it is considered that all the parties here are co-complainants, and claiming under the same deed of trust. And there was no other proper way to raise the question than by motion, or petition, as is provided by Rule 107.—*Foscue v. Lyon,* 55 Ala. 456.

2. As to the decree being rendered the same day the petition was filed, and without notice to the appellants, there is no assignment of error unless by implication; and it can not therefore be noticed. It will be observed that the appellants, being in fact the holders of the unindorsed bonds, came in, as did the holders of the indorsed bonds, and filed their bonds, and thereby became parties complainant to the bill of complaint; and as such, they were bound to take notice of any and all proceedings had in the cause, and especially of all motions and proceedings growing out of

[Colt v. Barnes.]

facts developed in the proceedings, and germane thereto; and also, especially, of all motions in regard to the distribution of the fund.

Upon the coming in of the master's report, this cause was submitted on 3d December, 1879, upon the following note of submission: " Motion to confirm report of register, and *on motion* of S. & W. Welsh *et al.*, holders of indorsed bonds of E. A. & C. R. R. Co., claiming priority of said indorsed bonds." The written petition, filed by oversight on December 5, 1879, was filed as an embodiment of this motion, based entirely on facts developed in the proceedings themselves. This submission was made in *term time ;* and the appellants being parties to the proceedings, as above shown, and as appears from the report of the register, either were actually, or presumed to be, present in court, and had all necessary notice. This motion was merely incidental, and is covered by the last clause of Rule 95, which says, "And at the calling of a cause, any incidental motion can be made."

3. The argument that the decree is erroneous, because the priority is made to cover the whole property of the road, when the State had a lien only on the sections completed, is based upon the statute of 1866-7, which was not the law governing this case. The indorsement of these bonds, as appears from the record, was obtained under the act of 21st February, 1870; the decree is strictly in accordance with its provisions, which are more comprehensive than those of the act of 1866-7.—See act 21st February, 1870, § 3, p. 149, Acts 1869-70. Furthermore, there is no assignment of error on this ground, and it can not, therefore, be considered. Again, the act of 21st February, 1870, section 4, contains the following provision, which is not found in the act of 1866-7, referred to in brief of appellants' counsel; " The governor may proceed to sell the *road, outfit,* and *equipments ;*" the third section providing, " said indorsement shall constitute a first lien, upon the section or sections of said road as far as completed, including road-bed, *superstructure,* and *equipment,* and the franchise of the company granted by this State, or under its authority." Such is the property, only, covered by the decree, and in this respect it is correct.

4. There is no question raised as to the validity of the State's indorsement of these bonds, and none can be raised except by the State itself.—See *Kelly et al. v. Barnes et al.,* 58 Ala. 489. The act itself gives the State a first lien upon the road, superstructure, equipments, and franchise; not as an indemnity, but " for the *payment* of all of said bonds indorsed for the company, as provided in this act, and for the interest accruing on said bonds," and with power to *sell*

the same for such purpose.—*Plock & Co. v. Governor*, at the present term. Furthermore, this power to sell is given in two events; and this power is not dependent on the fact that the road is entirely completed, but upon entirely different grounds. The whole act and decree are in consonance and full accord. The bondholders, holding indorsed bonds, being principal creditors of the corporation, are subrogated to all the securities the State had, and may proceed in equity to make them available in priority to any other creditor. Brandt on Suretyship & Guaranty, §§ 282 and 283, pages 380–1–2; *Saffold v. Wade's Ex'r*, 51 Ala. 214; *Curtis v. Tyler*, 9 Paige Ch. 432; *Dering v. Earl of Winchelsea*, 1 Leading Cases in Equity, 120; 2 Woods, C. C. 606. The same principle is, in effect, decided in this case when before this court on appeal heretofore.—*Kelly et al. v. Barnes et al.*, 58 Ala. 489.

5. These proceedings to enforce the mortgage by the trustees, and their approval by the holders of the indorsed bonds, can not be considered " an election to rely simply upon this security;" nor does it operate to release the State from liability. This is not one of the defenses which the State, as a surety, can set up against its indorsement of the bonds; nor does it fall under any of the heads into which the defenses available to a surety have been classified.—De Colyar on Guaranties, &c., ch. *Discharge of Surety*. The Roman law enabled the surety to force a suit against the principal debtor by the creditor, before any proceeding against the surety himself; and this rule prevails wherever the civil law obtains. Chancellor Kent says, " that there is nothing in such a rule inconsistent with the relative rights and duties of principal and surety, and it accords with a common sense of justice and the natural equity of mankind."—4 John. Ch. 123. While this rule does not prevail in America and England, unless expressly stipulated by the surety's contract, there is nothing militating against such a course, if the creditor please to pursue it; and especially where, by the consent of the surety, such a security is given as is created by this deed of trust. The statute expressly authorizes the indorsement by the governor of the first mortgage bonds of the company, but declares that such lien shall be inferior to its own. It seems to have been understood and contemplated that such bonds should be issued, and further secured by a deed of trust of the company, not only on the property on which the State might, by its indorsement of the bonds, acquire a statutory lien, but also on such other property as might be therein included. These parties very properly proceeded to exhaust the security given by the deed of trust, since otherwise the State might be discharged by reason of their *laches*

[Colt v. Barnes.]

and failure to realize on this security, and by allowing the same to be lost. When the creditor first sues the principal debtor, and makes available any of the securities provided, the surety is entitled to the benefit of it; and "when the creditor distrained upon the goods mortgaged to the surety by the principal debtor, for the same debt in respect to which the distress issued, it was held that, to the extent of the sum produced by the sale of the goods, the surety was discharged."—*Pearl v. Deacon*, 24 Beavan, 186; De Colyar, 427. This accords with reason and justice. The surety is discharged, or released, only so far as he has been damnified by the act or interference of the creditor; and especially is this the case when the surety, at the time of his contract, contemplated that the creditor himself should have a lien on the same property. The statute contemplates that a deed of trust, or mortgage, should be taken; yet why take it, if it was not intended that the creditor should proceed under it, in case of necessity? Whether the State has been discharged or damnified by the act of these creditors, can only be determined by a direct proceeding between them. The doctrine of election does not apply.

6. The bill averred that all the bonds were indorsed by the State. The first positive proof and information of the fact that there were also some unindorsed bonds, appears in and from the register's report; and the record shows that the holders of the indorsed bonds took the first opportunity thereafter to assert their priority. They proceeded properly by petition, which was the most expeditious, and really the only proper way.—*Foscue v. Lyon*, 55 Ala. 456. They could not have proceeded otherwise till they had the information, and especially until they were advised of the names of the persons who held the unindorsed bonds. By their action before the register, all the bondholders became parties to the cause—they were co-complainants, and were in court for all purposes in matters growing out of the proceedings; and they can not now complain of any want of notice. If they had been co-defendants, the rule might be different, and a cross-bill might have been necessary. Moreover, they moved to confirm the report of the register, which disclosed the very facts on which the right of priority is claimed

BRICKELL, C. J.—The original bill was filed by William H. Barnes and Henry Clews, as trustees in a mortgage executed on the first day of July, 1870, by the East Alabama and Cincinnati Railroad Company, to secure the payment of bonds to the amount of three millions five hundred thousand dollars, the company proposed to issue and negotiate, for

the purpose of borrowing money to aid in the construction, completion, and equipment of a railroad from Eufaula to Guntersville in this State. The bonds were prepared with the view of obtaining the indorsement of the State, under the act of the General Assembly, approved February 21st, 1870 (Pamph. Acts 1869–70, pp. 149–157), as is shown by the bonds and the mortgage; and in the mortgage, it is expressly recited and stipulated, that the title and lien thereby created is subordinate to the lien of the State, arising from its indorsement, declared by the act of the General Assembly aforesaid. The company issued and negotiated bonds, to the amount of seven hundred and five thousand dollars, of which only three hundred and ninety-five thousand dollars were indorsed by the State. It became bankrupt in 1873, and has been since in default in payment of the interest on the said bonds; and under proceedings in the course of bankruptcy, all its property had passed into the possession of purchasers of its equity of redemption. The mortgage provided, that if, for six months, the company was in default in the payment of principal or interest on said bonds, the trustees were to take possession, and make sale of the entire property mortgaged, which included all the property, rights, credits, and franchises of the company; and to apply the proceeds of the sales, first, to the liquidation and payment of the unpaid interest on the bonds, and then to the extinguishment of the principal.

In the progress of the present suit, a reference to the register was ordered, to ascertain and report the amount of the bonds of the company outstanding, indorsed by the State, and the amount of the bonds of the company outstanding not indorsed. Of the time and place of holding the reference, notice was given, and the holders of the bonds indorsed by the State appeared, and proved their claims; and the appellants, holders of bonds not indorsed, also appeared, and made proof of their claims. The register made a report, showing the amount of principal and interest of each class of bonds, and who were the respective holders thereof; to which no exception was taken, and it was confirmed. Thereupon, the holders of the indorsed bonds presented to the chancellor a petition, averring they were entitled to be subrogated to the lien of the State, created by the act of the General Assembly, to which the lien and security of the mortgage was expressly made subordinate, and were, of consequence, entitled to be first paid from the proceeds of sale, and praying it should be so declared in the decree of foreclosure and sale. On the same day of filing the petition, the chancellor rendered the final decree of foreclosure and sale,

[Colt v. Barnes.]

and declared that the holders of the bonds indorsed by the State were subrogated to the lien of the State, and must be first paid from the proceeds of sale, and so ordered and decreed the distribution of the proceeds of sale. From that decree, this appeal is prosecuted by the holders of the bonds not indorsed by the State.

To understand clearly the principal question involved, it is necessary to refer to the act of the General Assembly. The first section declares, that the credit of the State shall be afforded to corporations then chartered to construct railroads within the State, upon conditions thereinafter expressed. The second section provides, that when a railroad company had finished, equipped, and completed twenty continuous miles of road, at or near either terminus, or at the intersection or crossing of any other railroad in operation on the line of said road, the governor, on the application of the company, should indorse on the part of the State the first mortgage bonds of the company, to the extent of sixteen thousand dollars per mile for that portion of the road thus finished, completed and equipped; and should make a like indorsement for each continuous section of five miles, subsequently finished, completed, and equipped. The third section declares, that when the indorsement is made, the indorsement itself "shall constitute a first lien, upon the section or sections of said road as far as completed, including road-bed, superstructure, and equipment, and the franchises of the company granted by this State, or under its authority; and the State of Alabama, upon the indorsement of said bonds, and by virtue of the same, shall be invested with said lien or mortgage, without a deed from the company, for the payment by said company of said bonds, with the interest thereon, as the same becomes due; and when the whole of said road shall be completed, the State of Alabama shall be invested with a first lien, without a deed from the company, upon the entire road in this State, and the franchises granted by this State, or under its authority, including the right of way, grading, bridges, masonry, rails, spikes, and joint-fastenings, and the whole superstructure and equipments, and all the property owned by the company as incident to, or necessary for its business, including depots and depot stations, and all other property, real and personal, belonging to said company, or hereafter to be acquired by them, for the payment of all of said bonds indorsed for the company, as provided in this act, and for the interest accruing on said bonds; and after the governor, on the part of the State, shall have indorsed any bonds as aforesaid, for any road making application therefor, under this act, it shall not be lawful for

said company to give, create, or convey to any person or persons, or body corporate whatever, any lien, incumbrance, or mortgage of any kind, which shall have priority over, or come in conflict with the lien secured by this act; and any such lien, incumbrance, or mortgage, created after the passage of this act, shall be null and void as against such lien or mortgage of the State, as to any and all bonds so indorsed on behalf of the State under the provisions of this act; and the said lien or mortgage of the State shall have priority over all other claims existing or to exist against said company." The tenth section declares, " that this act shall be deemed and taken to be a public act as to all purposes." The fourth, fifth and sixth sections provide for the seizure of the road and all its assets by the governor, if at any time the company should make default in the payment of the interest on the bonds, and for a suit in chancery, in the name of the State, against the company, if default was made in payment of the principal when it became due.

It is obvious, if the company had executed to the State, for its security and indemnity, in the words of the statute, a mortgage, or a deed of trust, that all its property then held and owned, and all it subsequently acquired in its corporate capacity, *with the franchise granted to it by the State, or under its authority*, would have been included, and would have passed by the conveyance. No broader or more comprehensive terms could have been employed, than are found in the third section of the act, descriptive of and covering all the property it had capacity to acquire, whether such property was then existing, or subsequently acquired, including also the franchise it had derived from the State. If such mortgage, or deed of trust, had been executed, all who subsequently acquired any lien, or took any incumbrance upon the property or franchise, with notice of the prior mortgage or deed of trust, would take in subordination to it. The lien or mortgage (the terms are employed in the statute as synonymous) of the State is declared by the statute, which is a public act, and of itself operates as notice. The bonds issued by the corporation, indorsed, and unindorsed, refer to the act; the mortgage also refers to it, and declares that its security is in subordination to the lien of the State. The statute declares all other liens, incumbrances, or mortgages, created after the enactment, are void as against the lien of the State, and that " the said lien or mortgage of the State shall have priority over all other claims existing or to exist against the said company."

Liens in the nature of mortgages, created by statute, for the protection and indemnity of the State, are not infre-

quent in our legislation. They have not been regarded as of less force, or more limited in operation, than similar liens created by contract between individuals. In construing them, from the purpose for which they are created, and the terms employed in creating them, their scope and operation have been determined, as the scope and operation of a mortgage or other incumbrance would be ascertained. The Revised Code (§ 495) declared, that the bond of a tax-collector "operates, from its execution, as a lien in favor of the State or county, on the property of such tax-collector, for the amount of any judgment which may be rendered against him in his official capacity, for State or county taxes, and on the property of his securities from the date of his default." Of the lien thus created, in *Dallas County v. Timberlake*, 54 Ala. 403, we said, that it was unlike that of a judgment or execution of a court of law, merely a creature of legislation, not ordinarily within the cognizance of a court of equity; "but a tax-collector's bond being a contract, by which the law has previously declared liens shall be created, its liens are liens by contract, on the part of the persons who execute the bond, as much as that of a mortgage would be." The same doctrine was asserted in *Knighton v. Curry*, 62 Ala. 404. If any other construction of statutes creating such liens was adopted, the security it is intended they shall afford the State would be diminished in value, and the purposes of their enactment defeated.

As we have said, a mortgage, or deed of trust, employing the terms found in the statute, would embrace not only so much of the road as was completed, finished and equipped, when the bonds of the company were indorsed by the State, but all its subsequently acquired property.—*Galveston v. Cowdry*, 11 Wall. 439; *Meyer v. Johnston*, 53 Ala. 237; *S. C.*, at present term. For the security of the State against loss by its indorsements, the statute required that no indorsement should be made until twenty continuous miles of road had been *finished, completed, and equipped;* and that subsequent indorsements should be made, only as five continuous miles were *finished, completed, and equipped*. But the lien of the State is not confined to the section of the road, for which the indorsement is made. No indorsement could be made for a section of less than five miles. A road may have been completed, the length of which would not have authorized indorsements for every mile or fraction of a mile; yet, on its completion, the State would have been invested with a first lien on the entire road in this State. An indorsement may, as in this case, have been obtained by a road completing a section of twenty miles, and another section of five miles,

and then the enterprise may have failed, and been abandoned, a number of miles of the road less than five having been completed, for which no indorsement was obtained. Whenever an indorsement was obtained, the lien of the State attached, and attached not only to the road so far as completed, but to such parts of the road as were subsequently completed, and such property as was subsequently acquired, as it attached to the franchises of the company, which were incapable of division and separation, and of separate ownership. The very purpose of the statute, declared in its first section, was to afford railroad companies the high and superior credit of the State, to aid them in constructing their roads. A security commensurate with the great responsibility the State assumed in becoming the indorser and guarantor of their bonds, it was intended to provide, which should have priority over all other liens or incumbrances. That security would not be provided, if the narrow construction of the statute now insisted upon should be adopted, confining it to the particular sections of the road for which the indorsement may have been made.

The statute was framed with a knowledge of the mortgages railroad companies, in the incipiency of the enterprise in which they were engaged, were accustomed to execute, by which the whole undertaking, its existing and subsequently acquired property, and its franchises, were pledged to secure the payment of its bonds, issued and negotiated to raise money to aid in the construction and completion of the road. Such bonds could be, and were frequently executed; and without regard to the stage of the enterprise, when its bonds were issued and negotiated, the mortgage was an operative security for their payment, not only as to the road completed and property owned at the time of the negotiation, but as to all parts of the road subsequently completed, and property subsequently acquired. It was a lien and security of like kind the statute intended to furnish the State. Whenever the company made default in the payment of interest on the bonds indorsed by the State, whether the road was completed or unfinished,—whether there was an indorsement for more, or only twenty miles of the road, the governor was authorized to take possession and control of the *railroad, and all the assets thereof,* and to appoint a receiver, or receivers, who were to take its *rents, issues, profits, and dividends.* If the company refused to surrender possession, the governor was authorized to issue a warrant to the sheriff of each county, through which the road run, commanding him *to take possession of said road, fixtures, and equipments, and every thing appertaining thereto, and place the receiver in full and complete*

*possession of the same : and said receiver so appointed shall continue in possession of said road, fixtures, and equipments, and run the same, and manage the entire road, &c.* The statute is general in its terms necessarily, and while some of its words, taken by themselves, may indicate that the lien of the State was limited to the section or sections of the road completed, for which the bonds of the company were indorsed, yet regard must be had to all its parts and clauses, and the intent which is found in them. It can not be supposed it was intended that the governor should, in the event of the default of the company, take possession of any property, or transfer to a receiver the possession of any property, on which the lien of the State did not operate. Whatever property the company had at the time of the default, the governor was bound to place in the possession of the receiver of his appointment; and thus there is a clear expression of the extent of the lien.

That from the time the first bond is indorsed by the State, a lien attached to the *franchise* of the company, is expressly declared. The franchise is an entirety—it does not attach to any particular part of the road, or by fractions or parcels. Taking it in the narrowest sense of the term, it is the right, derived from the charter, to construct and maintain the road in its entire length, on the route designated in the charter, and to receive compensation for the transportation of persons or property over that road. There was no purpose to create a security on this franchise in favor of the State, and at the same time to limit the security to such parts of the road as were completed, and for which the State had indorsed the bonds of the company. We do not, therefore, assent to the argument of appellants' counsel, that the lien of the State must be confined to the parts of the completed road for which the bonds of the company were indorsed. We are of the opinion, that by the indorsement of the bonds of the company, the State acquires a valid lien, having all the force, qualities, and incidents of a mortgage, superior to all other liens created after the enactment of the statute of February 21st, 1870, upon the railroad and all its corporate property, and its franchises.

The general principle, upon which the decree of the chancellor rests, has not been controverted, but is admitted by the appellants. It has been frequently the basis of decision in this court, and we state it in the terms generally employed : A creditor is entitled to the benefit of all pledges, or securities, given to, or in the hands of, a surety, for his indemnity; and this, whether the surety is damnified or not,

as they are regarded as a trust created for the better secur-
ity of the debt.—*Toulmin v. Hamilton*, 7 Ala. 362 ; *Ohio Life
Ins. Co. v. Ledyard*, 8 Ala. 866 ; *Br. Bk. Mobile v. Robertson*,
19 Ala. 779 ; *Cullom v. Br. Bk. Mobile*, 23 Ala. 797 ; *Troy v.
Shields*, 33 Ala. 469 ; *Saffold v. Wade*, 51 Ala. 214. The
surety has a corresponding equity. Whenever he pays the
debt, he is entitled to stand in the place of the creditor, as
to all securities for the debt held or acquired by the creditor,
and to have the same benefit from them as the creditor
could have had, if he had chosen their appropriation to the
payment of the debt, instead of calling upon the surety.—2
Brick. Dig. 384, § 141. In *Knighton v. Curry*, *supra*, we held
that the sureties of a tax-collector, on paying a judgment for
the default of the principal, were entitled to be subrogated
to the statutory lien of the State and county on the property
of the principal.

When a branch of this cause was before this court, at a
former term, we intimated, that the holders of the bonds
indorsed by the State were entitled to be subrogated to the
statutory lien of the State.—*Kelly v. Barnes*, 58 Ala. 489.
While the appellants recognize this general principle, they
insist that it has no application, and is incapable of just
application to the lien the statute secures the State, which
is purely personal to the State, intended only for its protec-
tion and indemnity, and not for the security of the bonds, or
to create a fund for their payment. The question is not free
from difficulty ; and we were aware, when we formerly inti-
mated that the holders of the indorsed bonds were entitled
to subrogation to the lien of the State, of the distinction
made by the authorities, between a mere personal indemnity
to a surety, or an indemnity against a contingent liability,
never becoming absolute, and a trust or security for the pay-
ment of the debt and the protection of the surety. We do
not dwell upon or discuss now the extent of the distinction.
By the express words of the statute, the lien of the State is
declared to be " for the payment by said company of said
bonds, with the interest thereon, as the same becomes due ;"
and if the State, on the default of the company in paying
interest, takes possession of the road, whatever is derived
from its operation, after deducting expenses, is to be applied
" to pay and discharge the interest due on said bonds." If
this lien had been created in these terms, by mortgage, or
deed of trust, we would have been compelled, under our
former decisions, to pronounce that the creditor, whether he
had knowledge of its existence or not, and whether the State
had or not been damnified, was entitled to be subrogated to
the security it afforded. Protection, indemnity to the State,

is intended; but it is to be afforded by the payment of the debt. When the debt is paid, the State is fully protected, and ample protection the statute does not contemplate can be otherwise afforded. These bonds have gone out into the markets of the world, bearing the indorsement of the State, referring to the statute, inviting an examination of it, not only as the source of authority for an indorsement binding the State, but for the security the State had for the payment of the bond. They may have acquired value and currency because of this security, and there is no good reason, no substantial equity, for a narrow interpretation of the general words of the statute, converting it into a mere personal security for the State, incapable of enuring to the benefit of the creditor, instead of a security, in the words of the statute, *for the payment by said company of said bonds, with the interest thereon, as the same becomes due.*

The whole doctrine of subrogation rests upon equitable considerations and principles. The purpose, at last, is to make that thing or person bear a common burthen, which or who ought, in equity and good conscience, to bear it primarily, in relief or ease of another, only secondarily liable as between the two. Therefore it is that, generally, whenever a security is given by the principal debtor, either to the surety, or to the common creditor, for the payment of the debt, a court of equity will lay hold of it as a trust for the security of the debt, and will so execute the trust that the debt be paid. When the security is given to the surety, if the court subrogates the creditor to it, the surety is benefitted—it is for his ease. He is relieved from the vexation of suit, from payment of the debt, or from resorting to the legal remedies against the principal, or remedies to make the security available. The liability of the principal is extinguished, to the extent of the security, and justice is done to all parties in interest. In *Young v. M. & E. R. R. Co.*, 2 Woods, 606, the Circuit Court of the United States decreed, that the holders of bonds indorsed by the State were entitled to be subrogated to the lien of the State, under the act of 1867, which does not differ from the act of 1870, in any respect now material.

Nor is it unjust to the holders of bonds not indorsed, to decree subrogation and priority to the holders of the indorsed bonds. These bonds were acquired with full knowledge of the priority of the State; and it must be presumed whoever acquired them, intended that his rights should be, as they were by the mortgage, secondary, or in subordination to the rights of the State; and there is no equity in any claim now of equality with the holders of the indorsed bonds.

Upon decreeing a foreclosure and sale, after the amount of the mortgage debt had been ascertained, the chancellor, of necessity, must have determined and decreed the order in which these debts should be paid. No motion or petition was necessary to authorize the decree. It is not, therefore, important that a petition was filed invoking the decree, and that it was acted on without notice.

The decree is affirmed.